

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN THE MATTER OF THE SEIZURE OF:

ALL BITCOIN (BTC) AND TETHER (USDT)
VIRTUAL CURRENCY HOLDINGS
STORED IN THE ACCOUNT ASSOCIATED
WITH USER ID 546534713 AND E-MAIL
ADDRESS ddey0691@gmail.com AT THE
BINANCE CRYPTOCURRENCY
EXCHANGE

**UNDER SEAL**

Case No. 3:23-sw-58

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Michael J. McGillicuddy, after being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a seizure warrant.  Specifically, I

am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to its Washington

Field Office, Northern Virginia Resident Agency.  I have been employed by the FBI for more

than 17 years. From March 2015 through August 2016, I was a Supervisory Special Agent with

the Money Laundering Unit at FBI Headquarters with oversight over the FBI's Money

Laundering and Asset Forfeiture programs, among other threats.  I am currently assigned to a

squad which has investigative responsibility for fraud-based and other economic crimes.  I have

participated in numerous criminal investigations to include violations related to corporate fraud,

securities fraud, mail fraud, wire fraud, money laundering, and obstruction of justice.  Prior to

1

joining the FBI, I was a forensic accountant for an economic consulting firm. I am a Certified Public Accountant and a Certified Fraud Examiner.

2.      The facts in this affidavit come from my personal observations, my training and experience, review of records and documents, and information obtained from other law enforcement officials, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter. The dates listed in the affidavit should be read as "on or about" dates.

## PROPERTY TO BE SEIZED

3.      This affidavit is made to obtain a seizure warrant for all Bitcoin ("BTC") and Tether ("USDT") virtual currency holdings ("**SUBJECT ASSETS**") stored in the account associated with User ID 546534713 and e-mail address ddey0691@gmail.com ("**SUBJECT ACCOUNT**") at the Binance cryptocurrency exchange ("Binance"). On March 20, 2023, Binance confirmed that it had put a voluntary freeze on the **SUBJECT ACCOUNT** pending a documented official request (i.e., seizure warrant or court order). As of March 20, 2023, the date Binance froze the **SUBJECT ACCOUNT**, a sum of 2.0 BTC and 83465.49578069 USDT remained in the **SUBJECT ACCOUNT**. BTC is volatile and subject to significant changes in value. As of March 30, 2023, one BTC was worth approximately $28,033.56. As of March 30, 2023, one USDT was worth approximately $1.00. As of March 30, 2023, the value of the **SUBJECT ASSETS** in the **SUBJECT ACCOUNT** was approximately $139,532.62.

## LEGAL AUTHORITY FOR SEIZURE

4.      I have probable cause to believe that the **SUBJECT ASSETS** are subject to

seizure and forfeiture because they are proceeds of, or traceable to proceeds of violations of 18

U.S.C. § 1343 (wire fraud) and are involved in a violation of both 18 U.S.C. § 1956(a)(1)(B)(i)

(concealment money laundering) and 18 U.S.C. § 1957 (unlawful monetary transactions), and

therefore subject to civil forfeiture. Civil forfeiture authority is pursuant to 18 U.S.C. §§

981(a)(1)(A) and 981(a)(1)(C).

5.      18 U.S.C. § 1343 (wire fraud) prohibits, in pertinent part, whoever, having

devised or intending to devise any scheme or artifice to defraud, or for obtaining money or

property by means of false or fraudulent pretenses, representations, or promises, from

transmitting or causing to be transmitted by means of wire, radio, or television communication in

interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose

of executing such scheme or artifice.

6.      18 U.S.C. § 1956(a)(1)(B)(i) (concealment money laundering) prohibits, in

pertinent part, whoever, knowing that the property involved in a financial transaction represents

the proceeds of some form of unlawful activity, from conducting or attempting to conduct such

financial transaction which in fact involves the proceeds of specified unlawful activity ("SUA")

knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the

location, the source, the ownership, or the control of the proceeds of SUA.

7.      18 U.S.C. § 1957 (unlawful monetary transactions) prohibits, in pertinent part,

whoever, where the offense takes place in the United States ("U.S."), from knowingly engaging

3

or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which is derived from SUA.

8.      18 U.S.C. § 981(a)(1)(A) (civil forfeiture for violations of 18 U.S.C. §§ 1956 and 1957) provides for the forfeiture of any property, real or personal, involved in[1] a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957 as well as any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) (civil forfeiture for SUAs) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting an SUA, as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such SUA. 18 U.S.C. § 1956(c)(7)(A) provides that any act or activity constituting an offense under 18 U.S.C. § 1961(1) constitutes an SUA, with the exception of an act indictable under subchapter II of Chapter 53 of Title 31 of the U.S. Code. 18 U.S.C. § 1961(1) references violations of 18 U.S.C. § 1343.

10.     18 U.S.C. § 981(b)(2) provides that "[s]eizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure…".

11.     This Court has the authority to issue seizure warrants for assets located in another district and even outside the U.S. pursuant to 18 U.S.C. § 981(b)(3). Section 981(b)(3) provides that, "[n]otwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in

---

[1] Assets "involved in" a laundering violation include the corpus of the offense, any funds laundered, any proceeds, and any property facilitating the offense. United States v. Miller, 295 F.Supp.3d 690, 697 (E.D.Va. 2018) (collecting cases), aff'd, 911 F.3d 229 (4th Cir. 2018).

4

which a forfeiture action against the property may be filed under [28 U.S.C. § 1355(b)] and may

be executed in any district in which the property is found, or transmitted to the central authority

of any foreign state for service in accordance with any treaty or other international agreement."

18 U.S.C. § 981(b)(3).  Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in

any district court where any of the acts giving rise to the forfeiture occurred, even as to property

located outside the district.[2]

## BACKGROUND ON CRYPTOCURRENCY

12.    Based on my training, research, education, and experience, I am familiar with the

following relevant terms and definitions:

   a.    Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer

("P2P"), network-based medium of value or exchange that may be used as a substitute for

fiat currency[3] to buy goods or services or exchanged for fiat currency or other

cryptocurrencies.  Examples of cryptocurrency are BTC, Litecoin, Ether, and USDT.[4]

Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in

cloud-based servers.  Although not usually stored in any physical form, public and

private keys (described below) used to transfer cryptocurrency from one person or place

to another can be printed or written on a piece of paper or other tangible object.

---

[2] Binance is a cryptocurrency exchange registered in the Cayman Islands and, therefore, not
subject to U.S. jurisdiction and cannot be compelled by U.S. process.  However, as previously
stated, Binance has placed a voluntary freeze on the **SUBJECT ASSETS** and is willing to turn
them over to the U.S. with a seizure warrant issued by a U.S. Magistrate Or District Judge.

[3] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro,
or Japanese Yen.

[4] USDT is a cryptocurrency "stablecoin" pegged to the U.S. Dollar (i.e., 1.0 USDT =
approximately $1.00).

Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized P2P network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[5] Cryptocurrency is not illegal in the U.S.

      b.      BTC is a type of cryptocurrency. Payments or transfers of value made with BTC are recorded in the BTC blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire BTC through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), BTC kiosks (i.e., ATMs), or directly from other people. Individuals can also acquire cryptocurrencies by "mining." An individual can "mine" BTC by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public

---

[5] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

address, it may be possible to determine what transactions were conducted by that individual or entity. BTC transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it is not completely anonymous, BTC allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

c.      Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 26–36 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

d.      Users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys

7

("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g., Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code[6] with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

e.     BTC "exchangers" and "exchanges" are individuals or companies that exchange BTC for other currencies, including U.S. Dollars. According to Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual

---

[6] A QR code is a matrix barcode that is a machine-readable optical label.

exchanger operating as a business, are considered money services businesses.[7] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions.

f.      Although cryptocurrencies such as BTC have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

g.      Based on my training and experience, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts. However, with cryptocurrency this laundering has the potential to be done in a faster and more efficient manner than through banking institutions. Fraudsters attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the U.S. and laundered through cryptocurrency accounts maintained by people and fraudsters outside of the U.S.

---

[7] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-persons-administering.

h. Based on my training and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency to another, often rapidly and in quick succession, in order to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

## FACTS SUPPORTING PROBABLE CAUSE

### Investigation Background

13. This investigation involves a fraud scheme that is currently fashionable and being perpetrated by multiple criminal groups, both domestically and internationally. The perpetrators use a variety of schemes to trick or coerce victims, many of whom are elderly, into providing them money. Initial contact with victims is typically made with automated, previously recorded telephone calls, commonly referred to as "robocalls," that contain misleading messages that often include callback numbers for victims to contact. Once contact is established, real people in the conspiracy will speak with the victims. One common technique used by the perpetrators is to offer the victims maintenance assistance with their home computers, convincing them that there are problems with their home computers, sometimes by tricking the victims into downloading software that the perpetrators use to actually create problems with the victims' computers. Another common technique is to offer the victims loans, purport that the loans were approved and the funds deposited, and require the victims to send money back as directed as a demonstration of good faith or as a loan payment.

14. With regard to many of the victims identified in this particular investigation, a more common scheme involved messages creating a sense of urgency by telling victims that they

10

have some sort of serious legal problem, and that if they did not immediately take a particular action demanded by the callers then there would be drastic consequences, typically involving the arrest of the victims and/or significant financial penalties. The fraudsters almost invariably instructed the victims that, in order to prevent these dire consequences, the victims must pay money, by wire transfer or cash, to some supposed government entity.

15.     As a result of this investigation, between July 2020 and September 2022, 11 individuals who conspired to participate in the above-referenced schemes, which originated from several call centers in India, were convicted in the Richmond Division of this Court under case numbers 3:19-cr-160-HEH, 3:21-cr-47-HEH, 3:21-cr-48-HEH, 3:21-cr-49-HEH, 3:21-cr-70-HEH, and 3:22-cr-92-HEH.

**VICTIM #1**

16.     On January 24, 2023, VICTIM #1, a 71-year-old female residing in Richmond, Virginia, received a black-screen notification that her computer had been hacked and called the telephone number, purportedly for "Microsoft," provided on the pop-up screen notification. The purported "Microsoft" technician had VICTIM #1 download the AnyDesk remote desktop software application, which provided the technician with control of her computer. Upon scanning VICTIM #1's computer, the technician advised that certain funds in her account had been converted to BTC and used in a $25,000 transaction related to a child pornography website based in China. VICTIM #1 was then provided a case number with either the Federal Trade Commission or the Federal Communications Commission. VICTIM #1 was quickly referred to an individual identifying himself as "Adam Jones," purportedly from "Atlantic Union Bank"

11

(i.e., her bank), who advised that the only way to get her money back was to buy BTC to counter the transaction.

17.     As a result, on January 24, 2023, at the direction of "Jones," VICTIM #1 made a cash deposit of $15,000 at a BTC kiosk located at a gas station in or around Richmond.  The following day, on January 25, 2023, again at the direction of "Jones," VICTIM #1 made cash deposits of $10,000 and $15,000 at BTC kiosks in or around Richmond.  Specifically, "Jones" directed VICTIM #1 to make the second above-referenced $15,000 deposit after advising that her first $15,000 deposit, made the previous day, had not posted.  When "Jones" subsequently solicited yet another cash deposit on January 26, 2023, VICTIM #1 told him that she was no longer comfortable with the situation and called the FBI's Richmond Field Office.  That same day, on January 26, 2023, VICTIM #1 filed a complaint with the FBI's Internet Crime Complaint Center ("IC3") alleging a total loss of $40,000.

18.     On January 29, 2023, at my request, VICTIM #1 provided me with photographs of a receipt and screenshots of several text messages containing QR codes and confirmations for the above-referenced cash deposits.  I reviewed these photographs and screenshots.  They indicated that VICTIM #1's last deposit was for $15,000 in cash, resulting in 0.53798133 BTC (after fees) being deposited into BTC address bc1q9rmcvggjfta7pdgufj46jr8qwkfuzyqqgylk7v ("deposit address") on January 25, 2023.

19.     On March 17, 2023, the 0.53798133 BTC deposit described in the previous paragraph was further analyzed using BTC blockchain analysis tools.  It was determined that, on February 20, 2023, the deposit address was one of two inputs to transaction hash f6f7a7c1973a5bcdbc61ef74de1f09e834aa723c897df6ffb1d89f13ca402607, which sent

12

0.27574577 BTC to BTC address bc1q90t5ew77un69mc4yw6yg3v547tr89q3cjxxngv ("transfer address #1"). On March 15, 2023, transfer address #1 was one of 13 inputs to transaction hash f78278a5289ecfdf691ff7cf841f9f74d0f2bdb68af57918cd578d88f8a07865, which sent 4.0 BTC to BTC address bc1qlvdl40htv2p9ez8yqwj7sh0u0mt8msc3vxmhxs ("transfer address #2"). Ultimately, on March 17, 2023, transfer address #2 was one of two inputs to transaction hash 423dc19b9d9de4d008113597eb2aadb5be1a074b87dbc0ba3a09f59f02d72f39, which sent 5.0 BTC to BTC address bc1q0rfhrx32khnaj5v6ssjl4c9sm2ysqy6tukx6ps ("subject address"). BTC blockchain analysis further determined that the subject address was likely associated with Binance.

20.     On March 20, 2023, in response to my request, Binance confirmed that the subject address was held by the **SUBJECT ACCOUNT** at Binance.

### Binance Records

21.     On March 20, 2023, in response to my request, Binance voluntarily produced information on the **SUBJECT ACCOUNT** that held the subject address. The owner of the **SUBJECT ACCOUNT** was listed as Debojyoti Dey Dijendra Dey, a 31-year-old male Indian national maintaining a resident identity card in the United Arab Emirates.

22.     According to the **SUBJECT ACCOUNT**'s deposit history, the above-referenced deposit of 5.0 BTC (i.e., valued at approximately $137,103.80 at the time of the deposit) to the subject address, which included 0.27574577 BTC from VICTIM #1's last deposit, was the second to last deposit into the **SUBJECT ACCOUNT**, posting at approximately 9:00 a.m. UTC on March 17, 2023.[8] Approximately 40 minutes later, between approximately 9:40 a.m. and

---

[8] Another deposit of 5.0 BTC came into the account on March 18, 2023.

13

9:44 a.m. UTC, the **SUBJECT ACCOUNT** entered into two over-the-counter ("OTC") trades which collectively sold all 5.0 BTC and converted the BTC into USDT. According to the **SUBJECT ACCOUNT**'s withdrawal history, approximately 129,998 USDT (i.e., valued at approximately $130,349.94 at the time of the withdrawal) was then withdrawn from the **SUBJECT ACCOUNT** between approximately 9:24 a.m. and 9:31 a.m. UTC the following day (i.e., on March 18, 2023).

23. In total, the subject address received six different deposits totaling 17.08116554 BTC (i.e., valued at approximately $460,615.57 at the respective times of the deposits) in a very short period of time between March 14, 2023 and March 18, 2023. All three of the largest deposits of 5.0 BTC each were converted to USDT within 45 minutes of being deposited.[9]

24. On March 20, 2023, Binance confirmed that the **SUBJECT ACCOUNT** still maintained a balance of only 2.0 BTC and 83465.49578069 USDT (i.e., valued at approximately $137,964.37). Based on my training and experience, given the six different deposits totaling over 17.0 BTC (i.e., valued at over $460,000) that came into the **SUBJECT ACCOUNT** during the previous week, I believe the **SUBJECT ACCOUNT** is being used as a money laundering platform to launder the proceeds of the fraud committed against VICTIM #1 and other likely victims of Indian call centers.

25. According to the **SUBJECT ACCOUNT**'s access logs, logins to the account on March 17, 2023 and March 18, 2023 utilized IP addresses almost exclusively in Delhi, India.[10]

---

[9] Only 3.0 BTC of the last 5.0 BTC deposit was converted to USDT, leaving 2.0 BTC in the **SUBJECT ASSETS**.

[10] There was one login from an IP address in Guwahati, India on March 17, 2023.

### San Mateo Police Department Investigation

26.     On March 23, 2023 and again on March 27, 2023, I spoke with an officer with the San Mateo Police Department in San Mateo, California, who advised that he had also asked Binance to freeze the **SUBJECT ACCOUNT** based on a complaint from a 79-year-old male victim residing in the State of California.  That victim had been scammed by two individuals pretending to be a "Microsoft" computer technician and "Wells Fargo" fraud agent, respectively, who advised that the victim's devices had been hacked.  On March 2, 2023, the purported bank representative convinced the victim to deposit $15,000 (i.e., 0.48678 BTC after fees) into a BTC kiosk in or around Redwood City, California.  Similar to the 0.27574577 BTC from VICTIM #1's last deposit, the 0.48678 BTC deposited by the California victim was ultimately transferred to the **SUBJECT ACCOUNT** on March 17, 2023.  Furthermore, similar to VICTIM #1's funds, just a little over an hour after being transferred to the **SUBJECT ACCOUNT**, the BTC had been converted to USDT and withdrawn.

27.     The above-referenced officer further shared his request to Binance to freeze the **SUBJECT ACCOUNT**.  Based on this request, it is apparent that the California victim's funds also went through transfer address #2 before ultimately being transferred to the subject address. According to the officer, the San Mateo Police Department's BTC blockchain analysis tools indicated that transfer address #2 was associated with "scams using crypto ATMs."

28.     Based on my training and experience, my investigation related to VICTIM #1, and my review of the information provided by Binance and the San Mateo Police Department, I believe that the **SUBJECT ACCOUNT** is being used as a repository for stolen funds connected to Indian call center fraud.

15

## CONCLUSION

29.     Based on the foregoing, as well as my training, education, and experience, I submit that there is probable cause to believe that the **SUBJECT ASSETS** held in the **SUBJECT ACCOUNT** are not only proceeds of, or traceable to proceeds of violations of 18 U.S.C. §1343 (wire fraud) but also are involved in a violation of both 18 U.S.C. § 1956(a)(1)(B)(i) (concealment money laundering) and 18 U.S.C. § 1957 (unlawful monetary transactions), and therefore subject to civil forfeiture pursuant to the authority set forth in paragraph 4 of this affidavit above.  As previously stated, on March 20, 2023, Binance confirmed that it had put a voluntary freeze on the **SUBJECT ACCOUNT** pending a documented official request (i.e., seizure warrant or court order).

Respectfully Submitted,

Date: 4/3/2023

Michael J. McGillicuddy
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence on this ___ day of April 2023, at Richmond, Virginia.

/s/

The Honorable Roderick C. Young
UNITED STATES DISTRICT JUDGE

16